Me✓

STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss                                    CIVIL ACTION
                                                  DOCKET NO. CV-17-230


PATRICIA CLUKEY,

            Plaintiff

v.                                                ORDER


SOUTH PORTLAND HOUSING
AUTHORITY, et al.,                        **Plaintiff–Katherine McGovern, Esq.**
                                          **Defendants–James Bowie, Esq.**
            Defendants


In this action Patricia Clukey, a former tenant of the South Portland Housing Authority, primarily alleges that the South Portland Housing Authority violated 14 M.R.S. § 6025, the statute governing a landlord's access to a tenant's dwelling unit. Her complaint also alleges violations of the Maine Unfair Trade Practice Act, breach of contract, negligent infliction of emotional distress, and invasion of privacy.

A jury-waived trial was held on February 28, 2019.[1]

The court makes the following findings of fact and conclusions of law:

1. On April 5, 2016 Patricia Clukey was a tenant residing in unit 601 at 425 Broadway in South Portland.

---

[1] In addition to the South Portland Housing Authority, Ms. Clukey's complaint named two employees of the Housing Authority but her counsel acknowledged at trial that they were named only in their official capacity and they were then dismissed as defendants without objection. At the conclusion of Ms. Clukey's case, the court also granted the Housing Authority's motion to dismiss the Unfair Trade Practice Act claim concluding that, regardless of whether there had been a violation of 14 M.R.S. § 6025 in this case, Ms. Clukey had not proven in her direct case that the Housing Authority had engaged in any unfair or deceptive practice within the meaning of 5 M.R.S. § 207.

REC'D CU/B CLERKS OFC
MAR 6 '19 AM10:18

2. 425 Broadway, also called Hazard Towers, is an eight story apartment building operated by the South Portland Housing Authority and contains approximately 100 units occupied by elderly and disabled residents.

3. Ms. Clukey first became a tenant of 425 Broadway on June 13, 2012 under a lease (Def. Ex. 1) that included a "No Smoking Lease Addendum" that Ms. Clukey signed.

4. As of April 5, 2016 Ms. Clukey's residency was governed by a subsequent lease (Def. Ex. 2) that contained a no-smoking provision (section 21) initialed by Ms. Clukey and incorporated a "Smoke Free Campus Addendum" signed by Ms. Clukey.

5. Def. Ex. 2 contained a provision (section 11) governing the Housing Authority's right to enter Ms. Clukey's unit. This provision tracked but was not identical to the statutory provisions in 14 M.R.S. § 6025.

6. In pertinent part, 14 M.R.S. § 6025 provides:

> 1. **Tenant obligations.** A tenant may not unreasonably withhold consent to the landlord to enter the dwelling unit in order to inspect the premises, make necessary or agreed repairs, decorations alterations or improvements, supply necessary or agreed services or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workers or contractors . . . .

> 2. **Landlord obligations.** Except in case of emergency or if it is impracticable to do so, the landlord shall give the tenant reasonable notice of his intent to enter and shall enter only at reasonable times. Twenty-four hours is presumed to be a reasonable notice in the absence of evidence to the contrary.

7. The corresponding provision in section 11 of the Housing Authority lease provided:

> B. Authority shall upon reasonable advance notice to Resident be permitted to enter the dwelling unit during reasonable hours for the purpose of performing routine inspection and maintenance, for making improvements or repairs, or to show the Premises for re-leasing whether or not the resident is present. A written statement specifying the purpose of Authority delivered to the Premises at

2

least twenty-four (24) hours before such entry shall be considered reasonable advance notification . . . .

C. Authority may enter the Premises at any time without advance notification when there is reasonable cause to believe that an emergency exists.

8. The lease provision that the Authority "may enter the Premises at any time without advance notification when there is reasonable cause to believe that an emergency exists" is based on identical language in the federal regulations setting forth lease requirements for public housing authorities receiving federal funds. 24 C.F.R. § 966.4(j)(2).

9. In addition to the provisions of the lease, the Housing Authority had distributed and posted notices in January 2013 and in December 2014 (Pl. Ex. 1 & 2) noting that it appeared that some residents were violating the no smoking policy. Those notices stated in pertinent part:

> If Housing Authority staff smells smoke or burning near your unit, they will knock on the door and enter. If you are not home, or do not answer the door, they may use a master key to enter and inspect your unit. Any smoke or burning is a safety concern and threatens all residents at the property.

10. Within the 15 months preceding April 5, 2016 there had been two fires at South Portland Housing Authority housing. The Housing Authority had been informed and understood that both of those fires had resulted from cigarettes – one from a cigarette that had not been extinguished properly and one from a tenant who had been smoking in bed.

11. On April 5, 2016 at about 4:15pm Dan Mazziotti, a maintenance worker at the Housing Authority, was making rounds at 425 Broadway. Mazziotti, a former policeman, began working for the Housing Authority at the beginning of 2016 . On April 5 he was working his way through the building from bottom to top, walking the length of each floor to make sure everything was in order.

3

12. Mazziotti did not smell smoke or observe anything amiss on the first five floors. Leaving the stairwell onto the sixth floor, he smelled smoke that he thought was most likely cigarette smoke but that seemed acidic enough that it could have come from another source. Mazziotti determined that the smoke was emanating from Unit 601; he checked nearby units and did not detect any smoke coming from those units.

13. The door of unit 601 was closed. There was a sign on the door that said, "Sleeping, do not disturb." Mazziotti also saw that a cloth door stopper had been placed along the bottom of the door.

14. Mazziotti knocked on the door several times, waited for a response and hearing none, knocked several times again. When there was no response he knocked a third time. By this time more than a minute had passed since he began knocking.

15. Thereafter he heard someone walking toward the door and he heard a female voice (Ms. Clukey) ask who it was. Mazziotti replied, "Maintenance," and said he smelled smoke. At that point Ms. Clukey said she needed to put some clothes on. After waiting another 45 seconds or so, Mazziotti knocked again and repeated that he smelled smoke. Ms. Clukey then said that she was in the bathroom, and Mazziotti said he would crack the door open. He then used his master key to open the door a short distance. When he cracked open the door, he could not see directly into the apartment but could see the hallway wall closest to the door.

16. Ms. Clukey then came to the door. She may not have been fully dressed but she had clothes on. At this point the door was open far enough that Mazziotti could see that some of the windows were fully open, although the temperature was below 40 degrees outside. He also saw that there was a fan blowing air out toward the windows. Mazziotti still smelled smoke and by that time he could tell for certain that it was cigarette smoke and could see that there was no fire.

4

17. Ms. Clukey denied to Mazziotti that she had been smoking and suggested that the smell of smoke came from stale smoke from a box of photo albums she had received from her brother or had come from outside. Although at trial Ms. Clukey adamantly repeated the denial that she had been smoking, the court finds that it is more likely than not that she was smoking in her apartment when Mazziotti began knocking on her door – based on the fresh and obvious smell of smoke, the doorstop, the open windows, the fan, and the weakness of Ms. Clukey's explanation.

18. Mazziotti told Ms. Clukey that smoking was against the rules and said he would report the incident. She asked if she would be evicted and he said he did not know. Mazziotti then left. Throughout all these events Mazziotti stood just outside the entrance to Ms. Clukey's apartment. He never entered the apartment or stepped over the threshold.

19. If Mazziotti had not been able to ascertain whether or not there was a fire, his instructions were to call the Fire Department. On other occasions calls to the Fire Department had led to the evacuation of entire Housing Authority buildings, which in the case of the elderly and disabled tenants at 425 Broadway would have created a very serious problem.

20. Within a half hour after Mazziotti left, Ms. Clukey called the South Portland police to complain.

21. Ms. Clukey had been cited for smoking in her apartment about five months before the events of April 5, 2016. On that occasion she had been threatened with eviction, but eviction proceedings had been suspended when she signed a document (Defense Ex. 3) agreeing that she would not smoke and knew she was on probation.

22. Mazziotti was not aware of that prior incident and did not know that Ms. Clukey was on probation when he knocked on Ms. Clukey's door on April 5, 2016. He was drawn to her unit solely by the smell of smoke.

5

23. After receiving a report from Mazziotti about the April 5 incident, the Housing Authority took steps to terminate Ms. Clukey's tenancy based on her smoking. This resulted in an administrative hearing in late April and the commencement of a forcible entry and detainer action in mid-May.

24. The forcible entry and detainer action was resolved by Ms. Clukey's agreement to vacate if given an extension until September 30, 2016 to do so. Ms. Clukey ultimately left 425 Broadway in early October.

25. Ms. Clukey's departure from the South Portland Housing Authority had extremely unfortunate consequences for her. Before she left, she had not found alternative housing and was essentially homeless for more than a year, living in her car and staying occasionally with relatives and friends (including one friend at 425 Broadway) until December 2017. Ms. Clukey had been receiving psychiatric treatment, mostly for depression, prior to April 6, 2016 and continued to obtain such treatment thereafter. She also has diabetes. Both of these conditions were exacerbated by her homelessness from October 2016 to December 2017.

26. Ms. Clukey ascribes most or all of the significant anxiety she experienced to Mazziotti's opening of her door on April 5, 2016 and contends that she agreed to leave 425 Broadway because of her fear that her door could again be opened against her wishes. However, she has not met her burden of proof on those issues. It is at least as likely that her mental distress was caused by the likelihood that she would face eviction and that her agreement to vacate was based on the probability that the Housing Authority would prevail in the FED action.

27. Regardless of whether Ms. Clukey was smoking in her apartment, the issue before the court is whether she has proven that the circumstances under which Mazziotti used his key to open

6

the door did not constitute an "emergency" within the meaning of 14 M.R.S. § 6025(2) and section 11 of the lease.[2]

28. Based on the specific circumstances of this case, the court finds that Ms. Clukey has not proven by a preponderance of the evidence that no emergency existed. The possibility that the smoke emanating from Ms. Clukey's unit was caused by a fire in a high rise building housing elderly and disabled tenants constituted an emergency justifying entry.

29. The fact that Ms. Clukey answered from inside the door was not sufficient to dispel Mazziotti's reasonable belief that the smoke posed a potential danger of fire. It would be possible for an elderly or disabled resident to be confused or to be unwilling to acknowledge the presence of a smoldering fire because of the fear of eviction.

30. 14 M.R.S. § 6025(2) must be interpreted in terms of the situation as understood by a landlord or a landlord's representative at the time of entry and is therefore consistent with section 11 of the lease and 24 C.F.R. § 966.4(j)(2). The existence of an emergency cannot be determined retroactively. Otherwise the Housing Authority would be subjected to liability if ultimately there were no fire – even when the possibility of a fire had constituted an emergency justifying entry.

31. This ruling is based on the specific facts in this case. The court is not presented with a situation where the Housing Authority entered Ms. Clukey's unit because it suspected her of smoking and wanted to look for evidence to support that suspicion. Moreover, the court is not presented with a situation where a unit was entered because a maintenance man did not perceive a current smell of smoke but only the obviously stale odor of a past cigarette.

---

[2] The Housing Authority is not arguing in this case that Mazziotti's use of his master key to open the door without ever physically entering the unit did not constitute an "entry" of Ms. Clukey's unit.

32. Given that Ms. Clukey has not met her burden of demonstrating that there was no emergency, the court also finds that there was no violation of section 11 of her lease. In addition, Ms. Clukey has not proven that there was an actionable invasion of her privacy. To establish liability for invasion of privacy based on intrusion on a person's solitude or seclusion, the intrusion would have to be highly offensive to a reasonable person. Restatement 2d of Torts § 652B. An intrusion to determine whether there was a fire in a high rise building housing elderly and disabled tenants is not an intrusion that would be highly offensive to a reasonable person.

33. Finally, Ms. Clukey has asserted a claim for negligent infliction of emotional distress (NIED). However, NIED recovery is limited to bystander liability claims and cases where a special relationship existed between victim and tortfeasor. *See Curtis v. Porter,* 2001 ME 158 ¶ 19, 784 A.2d 18. Neither of those situations is presented here. Moreover, it follows from the findings above that Ms. Clukey has not met her burden of demonstrating that the conduct of the Housing Authority was negligent.

The entry shall be:

Judgment shall be entered in favor of defendant South Portland Housing Authority dismissing plaintiff Patricia Clukey's claims after trial. The clerk shall incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: March 5, 2019

Thomas D. Warren
Justice, Superior Court

Entered on the Docket: 3/6/19

mc/

8